UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

DAVID MARKWOOD                        )
                                      )
V.                                    )      NO. 2:03-CV-323
                                      )      *(Greer/Inman)*
DARRELL GREEN, SR., *ET AL.*          )


<u>REPORT AND RECOMMENDATION</u>

        This is a civil rights suit filed pursuant to 28 U.S.C. § 1983.  When plain-

tiff's various claims and theories of recovery are reduced to their essence, he claims

that he was falsely arrested for theft of over $1000 from the defendant Greene and

thereafter maliciously prosecuted, i.e., without probable cause, as a result of the

actions of the various defendants.

        Plaintiff has filed a motion for (partial) summary judgment, asking that the

Court declare that the undisputed facts reveal there was no probable cause to arrest him

[Doc. 24].

        The defendant Steve Wheat, the officer with the Jonesborough Police

Department who investigated the complaint lodged against plaintiff by Greene and

thereafter initiated the prosecution, has moved for summary judgment in his individual

capacity [Doc. 17], insisting that he had probable cause to arrest and prosecute plaintiff

or, if he did not, he nevertheless is entitled to qualified immunity, arguing that a

reasonable police officer would have concluded that probable cause existed to prosecute

plaintiff.  Additionally, the defendants Steve Wheat (in his *official* capacity), Wheat's supervisor, Craig Ford (also, in his official capacity), and the Town of Jonesborough have moved for summary judgment [Doc. 18].

These motions have been referred by the District Judge to the Magistrate Judge for a report and recommendation.[1]  Oral argument was held on August 26, 2005.

After these motions were referred to the Magistrate Judge, an order was entered directing the parties to prepare a joint statement of relevant and material facts with respect to the motions for summary judgment, which is filed as Doc. 50.[2]  The attorneys wisely categorized the facts into different sections, each section dealing with a specific claim or defense.  In other words, some facts are relevant to one claim or defense, but not others; and some facts are generally relevant to all claims or defenses. As the Court addresses a particular claim or defense, it will discuss only the facts relevant thereto.  There are a few objections by one party or the other scattered throughout the joint statement, most of which are based on a lack of materiality or relevance.  Hopefully, it will be apparent from the Court's discussion which facts were deemed dispositive, and which were ignored.  The joint statement is as follows:

---

[1]Orders, Docs. 46, 48.

[2]The Court expresses its sincere appreciation to the attorneys.  The Court required the parties to prepare their joint statement on extremely short notice, and doubtlessly a great deal of frenetic activity was required for them to accomplish the task as quickly as they did.

2

## JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS
## REGARDING PENDING MOTIONS FOR SUMMARY JUDGMENT

### Introduction

Pursuant to this Court's Order of August 18, 2005 (Docket No. 49), the parties are submitting this Joint Statement of Undisputed Material Facts. With respect to each "undisputed material fact" set forth, the Court may find an objection from one of the parties that either a particular fact is disputed or that a particular fact is not material.

### Material Facts Relevant to Defendants' Motion for
### Summary Judgment on Judicial Estoppel

1. On September 10, 2002, David W. Markwood was arrested and taken to jail for the crime of theft over $1,000.00.

2. At the time of his arrest, Markwood believed that he had done nothing wrong, that he did not owe Greene any money, that the arrest was politically motivated and that his constitutional rights had been violated.

3. On December 13, 2002, Markwood filed a Chapter 7 Bankruptcy Petition in the United States Bankruptcy Court. In the Petition, he estimated his assets as between $0 to $50,000. He estimated his debts as between $500,001 to $1 million. (Markwood depo. at Ex. 10) The filing date of December 13, 2002 is not legible on Exhibit 10 to Markwood's deposition. Therefore, Exhibit B to the Town's Motion for Summary Judgment is a certified copy of the Voluntary Petition that reflects the December 13, 2002 filing date.

4. On January 28, 2003, Markwood filed an amendment to his "Schedule B - Personal Property" of his Bankruptcy Petition. Markwood failed to disclose any contingent or unliquidated claims as required by the Bankruptcy Court.

5. On January 28, 2003, Mr. Markwood filed an Affidavit with the Bankruptcy Court making oath that the Amended Schedules are true and accurate statements as of December 13, 2002.

6. On February 26, 2003, the Bankruptcy Trustee, Margaret Fugate, filed a Trustee's Report stating that there was no property available for distribution from the Estate of Markwood.

7. On March 5, 2003, Markwood's criminal case proceeded to trial, and the Criminal Court Judge dismissed the charge on that date.

8. On April 1, 2003, United States Bankruptcy Judge Marcia Parsons entered a "no assets" Chapter 7 discharge of the debtor, Markwood.

9. On May 19, 2003, Judge Parsons entered a final decree that closed this Chapter 7 Bankruptcy.

10. On September 5, 2003, Markwood filed the instant civil rights action seeking $1 million dollars in compensatory damages and $1 million dollars in punitive damages.

11. Throughout his bankruptcy and the criminal proceedings, Mr. Markwood was represented by counsel, Tom Cowan. Mr. Cowan did not suggest to Mr. Markwood that he had a civil rights case as a result of being arrested, nor did Mr. Cowan suggest that he needed to list a civil rights claim as a potential asset. (Ex. No. 3 and No. 15)

Defendants' Objection: This fact is not material because this is not a means of establishing "inadvertence" under Sixth Circuit law.

**Material Facts Relevant to Defendants' Motion for**
**Summary Judgment on Probable Cause / Qualified Immunity**

12. On May 17, 2000, David Markwood on behalf of Markwood & Sons Trucking entered into a lease agreement with Darrell Greene, Sr. in which Mr. Greene would drive his own tractor-trailer on behalf of Markwood & Sons Trucking.

13. Mr. Greene owned a tractor (truck), but he did not own a trailer. Therefore, on this same day (May 17, 2000), Greene purchased a trailer from Mr. Markwood for $12,500.00. The purchase of the trailer is evidenced by a "Sales Agreement: Insurance Agreement" (hereinafter, "Sales/Insurance Agreement") executed by the parties.

14. The Sales/Insurance Agreement entered into between Mr. Greene and Mr. Markwood on May 17, 2000 established the purchase price for the trailer at $12,500.00. The amount owed to PACCAR as of May 17, 2000 was $24,015.15. The actual amount owed to PACCAR by Mr. Markwood for the trailer was not disclosed to Mr. Greene. (Markwood depo. Ex. 1 and p. 26; Calculation from PACCAR records, Ex. 3 and 4 to Markwood deposition, see chart p. 3, Wheat's Motion for Summary Judgment)

Plaintiffs' Objection: Plaintiff objects on the basis of relevance.

15. When Mr. Greene, Sr. and Mr. Greene, Jr. made their complaint about Mr. Markwood to Officers Patton and Wheat at the Jonesborough Police Department, they told the officers that they had consulted an attorney who had advised them to report the matter to the police. (Wheat depo. pp. 91-92; Greene, Jr., depo. p. 32; Wheat Motion for Summary Judgment)

Plaintiff's Objection: Plaintiff objects on the basis of relevance.

16. At the time Mr. Markwood sold this trailer to Mr. Greene, Mr. Markwood did not own the trailer outright. Mr. Markwood was making monthly payments of $880.53 to PACCAR Financial. (Markwood depo., pp. 24-25, Ex. 3 "Financial Security Agreement").

17. The Sales/Insurance Agreement provided that Mr. Greene would pay Mr. Markwood $880.00 per month at the rate of $220.00 per week or per trip. In other words, Mr. Markwood was in essence seeking to have Mr. Greene take over his payments to PACCAR Financial – although Mr. Greene was to pay Mr. Markwood, not PACCAR. (Markwood depo. p. 24). After each trip, Mr.

4

Markwood and Mr. Greene would settle up and create a settlement sheet that they both signed.

18. If everything had gone according to plan, Mr. Markwood would have received enough money from Mr. Greene so that Mr. Markwood could have made his trailer payment to PACCAR without paying any money out of his own pocket (other than the $.53 differential between the amount anticipated from Mr. Greene, $880.00, and the amount owed PACCAR, $880.53).

19. However, Mr. Greene did not make four trips most months as the parties contemplated and as is implied by the language in the Sales/Insurance Agreement. The result was that Mr. Markwood had to use some of his own money to make payments to PACCAR.[1] (Markwood depo. p. 29)

20. From May 17, 2000 through January 12, 2001, Mr. Markwood paid to PACCAR $2,353.05 more than he had received from Mr. Greene.

21. After January 12, 2001, Mr. Markwood stopped making trailer payments to PACCAR.

22. On January 17, 2001, Mr. Markwood and Mr. Greene agreed to raise the per trip trailer payments from $220.00 to $293.33 so that Mr. Markwood could receive $880.00 per month if Mr. Greene only made three trips per month.

23. Mr. Greene made increased trailer payments on the following dates and Mr. Markwood did not forward any of these monies to PACCAR: February 7, 2001, February 27, 2001, March 13, 2001, March 26, 2001, April 6, 2001, April 9, 2001, May 4, 2001, May 12, 2001, May 22, 2001, June 4, 2001, June 11, 2001, June 20, 2001 and June 27, 2001.

24. Mr. Markwood told Mr. Greene in the late Spring of 2001 that he was not going to be able to keep his business afloat and that he was going to have to file bankruptcy. He also told Mr. Greene that he (Mr. Greene) could have the trailer if he could pay off the loan. However, Mr. Greene was unable to pay off the loan. (Citation to be supplied by Plaintiff's counsel)

<u>Defendants' Objection</u>: These facts are not material on the issue of probable cause or qualified immunity. Further, Mr. Greene denies any knowledge of Mr. Markwood contemplating bankruptcy. (Greene's depo. p. ___, Wheat's Motion for Summary Judgment)

25. Because Mr. Markwood stopped making payments to PACCAR, the finance company ultimately repossessed the trailer from Mr. Greene at the end of June 2001, and Mr. Greene made no more trips for Markwood & Sons Trucking.

26. On June 18, 2002, Darrell Greene, Sr. and Darrell Greene, Jr. met with Sgt. Patton and Major Steve Wheat of the Town of Jonesborough Police Department and complained that David W. Markwood had taken money from

_____

[1]There is a dispute between Mr. Markwood and Mr. Greene as to which one of them was at fault for the fact that Mr. Greene did not make four (4) trips per month. [NOTE: This footnote is in the parties' Joint Statement.]

Mr. Greene, Sr. as payment for a trailer, but the trailer was then repossessed and Greene was out both the money paid to Markwood and the trailer. In other words, Greene complained that he had been swindled and cheated by Markwood.

27. Steve Wheat had the trip settlement sheets showing all trailer payments that Mr. Markwood had deducted from Mr. Greene's pay. Officer Wheat then obtained from PACCAR its records showing what payments Mr. Markwood had made to PACCAR. Based on a comparison of these records from February, 2001 through June, 2001 (when the trailer was repossessed), Officer Wheat calculated and concluded that Mr. Markwood had retained $4,544.63 of Mr. Greene's money that should have been forwarded to PACCAR.

28. Officer Wheat did not do a comparison of the records (settlement sheets) from May, 2000, to January 2001. He did not know that although Mr. Greene was obligated under the contract to pay Mr. Markwood $880 a month, Mr. Greene was not doing so. He did not realize that in some months, Mr. Greene only made one or two trips and only paid Mr. Markwood $220 or $440 respectively.

29. Officer Wheat consulted with Assistant District Attorney Dennis Brooks about the Markwood case before any presentment was made to the Grand Jury.

30. Officer Wheat never showed to A.D.A. Brooks the parties' May to December settlement sheets until after the criminal trial. Further, Assistant District Attorney Brooks was led to believe by Officer Wheat that the entire course of dealings between Mr. Markwood and Mr. Greene was from only January to June 2001. (Citation to be supplied by Plaintiff's counsel)

Defendants' Objection: Officer Wheat had his entire case file with him when he met with Assistant District Attorneys Dennis Brooks and Steve Finney. The case file contained all settlement sheets from May 2000 to June 2001. It contained the Sales/Insurance Agreement that A.D.A. Brooks believes he reviewed. The case file contained the PACCAR records Wheat had obtained by subpoena. Officer Wheat did not prevent A.D.A. Brooks from examining any part of his case file. The Sales/Insurance Agreement is dated May 17, 2000 and therefore, A.D.A. Brooks had information before him indicating the relationship between Mr. Greene and Mr. Markwood commenced in May 2000. It is true that Officer Wheat focused only on the settlement sheets from January 2001 through June 2001 and compared only those settlement sheets to the PACCAR records showing non-payment during this same time period. Neither Officer Wheat nor A.D.A. Brooks discussed or considered the May 2000 through December 2000 settlement sheets that were in the case file at the time of their meeting.

Plaintiff's Objection: Plaintiff objects to the facts set forth in the Defendants' Objection.

31. One of the tasks of an officer bringing a case for prosecution to the D.A.'s office in Washington County is the preparation of a "Prosecution Report Form". Wheat filled one out for prosecutor Brooks in the Markwood case, and

that document contains two factual errors:

(1) It states that "Markwood was to and did hold back $880.00 per month from Mr. Greene's payroll to make the payments to PACCAR Financial, lien holder on the trailer."

(2) Greene paid Markwood $4,544.63, which Markwood did not deliver to PACCAR.

These two (2) statements in the Prosecution Report Form, relied upon by the District Attorney General's Office, were erroneous. (Ex. No. 6, Brooks depo. at 56-57; Ex. No. 5, Wheat depo. at 117, 118, 119). (Ex. No. 20, State v. Markwood Criminal Transcript of March 5, 2003 at 120-121)

32. Officer Wheat derived the $4,544.63 stated in the "Prosecution Report Form" by adding the amounts deducted from Mr. Greene's pay from mid-January through June 2001, none of which was forwarded to PACCAR during the corresponding time period. (Wheat depo. p. __; Wheat's Motion for Summary Judgment)

33. Prosecutor Brooks testified in his deposition that if he had known before Wheat went to the grand jury what he knew after the criminal trial, he might very well have left it to the civil arena. (Ex. No. 6, Brooks depo. at 55). He agreed with the statement of the counsel to Mr. Markwood that a grand jury can indict a ham sandwich. (Ex. No. 6, Brooks depo. at 55).

<u>Defendants' Objection</u>: A.D.A. Brooks repeatedly testified that after his review of all the evidence following the dismissal of the criminal charges against Mr. Markwood that probable cause existed to indict Mr. Markwood for the crime of theft in excess of $1,000.00. (Brooks depo. pp. 14, 43, 44, 48, 53, 55, 63 from Wheat Motion for Summary Judgment)

34. The District Attorney's office serves as a gatekeeper as to matters going before the grand jury. (Wheat Motion for Summary Judgment, Brooks depo. pp. 9-10).

35. On September 10, 2002, Mr. Markwood was arrested based upon a Grand Jury indictment for the crime of theft over $1,000.00. (Wheat depo., p. 45). His case proceeded to trial on March 5, 2003. Steve Wheat was the first witness called by the State. During the cross-examination of Officer Wheat, Attorney Tom Cowan began pointing out that a review of the settlement sheets revealed that most months Mr. Greene did not make four trips per month, and consequently, Mr. Greene was not making the payment of $880.00 as called for in the Sales/Insurance Agreement. (Exhibit "B" to Wheat's Motion for Summary Judgment, Criminal Trial Transcript, pp. 87-90).

36. Judge Cupp sent the jury out and asked Assistant District Attorney Dennis Brooks for a response. Assistant D.A. Brooks had none. According to Brooks, Officer Wheat had not provided him with all of the settlement sheets. Officer Wheat had all the settlement sheets from May 2000 until June 2001 and thought they had been provided to Assistant D.A. Brooks. (Ex. B, Criminal Trial Transcript, pp. 105-110).

37. Even though Officer Wheat had all of the settlement sheets, he did

not realize until after the criminal trial that it was significant that Mr. Greene had not made four (4) trips per month, thereby resulting in Mr. Markwood paying money out of his pocket to PACCAR between May 2000 and January 2001. (Wheat depo., p. 66).

38. Judge Cupp then dismissed the case *sua sponte*, and specifically said that Mr. Markwood had done nothing wrong and that he had not stolen anything. (Ex. "B" to Wheat's Motion for Summary Judgment, Criminal Trial Transcript, pp. 120-121).

Plaintiff's Objection to paragraphs 39-46: Mr. Markwood objects to paragraphs 39-46 on the basis of relevancy.

39. Mr. Markwood admits that he was obligated to forward all trailer payments received from Mr. Greene to PACCAR. (Markwood depo., Vol. I, p. 69, Supplemental depo. p. 8, *See,* also Ex. A to Wheat's Motion for Summary Judgment).

40. A thorough review of all settlement sheets from May 2000 through June 2001 would have revealed that Mr. Markwood failed to forward more than $2,000.00 of Mr. Greene's money to PACCAR (even after giving Mr. Markwood credit for monies paid out of his pocket). (Markwood depo., Vol. I, p. 69, Supplemental depo. p. 8, *See,* also Ex. A to Wheat's Motion for Summary Judgment).

41. At the time of the Criminal Court dismissal, no one had compared: (a) all trailer payments from Greene to Markwood with (b) all trailer payments from Markwood to PACCAR to determine whether Mr. Markwood had improperly kept any of Mr. Greene's money, and if so, how much. Officer Wheat had not made this calculation. (Wheat depo. p. 63). Assistant D.A. Brooks had not made this calculation. (Brooks depo. p. 26-30). Criminal defense attorney Tom Cowan had not made this calculation (Cowan depo. p. 28-29, 36) -- and consequently, no such evidence was presented to Judge Cupp when he *sua sponte* determined that Mr. Markwood had done nothing wrong. (Cowan depo. p. 26, 37).

42. When Mr. Markwood gave his discovery deposition on May 19, 2004, he had no explanation as to why trailer payments received from Mr. Greene after mid-January 2001 were not forwarded to PACCAR. (Markwood depo., 69).

43. The sales/insurance agreement entered into between Mr. Markwood and Mr. Greene on May 17, 2000 provided that Mr. Markwood would "take out cargo & liability ins. at the rate of 143.33 per pay day or each check. For truck and trailer." (Wheat Motion for Summary Judgment, Ex. 1, Markwood deposition, Sales Agreement: Insurance Agreement).

44. Neither the tractor nor the trailer which was the subject of the sales/insurance agreement between Mr. Markwood and Mr. Greene was ever covered by any liability insurance policy on or after May 17, 2000. (Answer to Wheat's First Request for Admissions, Request No. 2, Doc. Entry 26, 10-13-04).

8

45. Mr. Markwood deducted from Mr. Greene's paychecks a total of $4,305.00 for insurance that was never provided for Greene's tractor and trailer. (Markwood's Response to Motion for Summary Judgment, Ex. 8, "Insurance Deductions").

46. During Officer Wheat's investigation and interview of Mr. Greene, Wheat was told by Greene that he had been involved in an accident and an unpaid judgment had been entered against Greene. (Wheat depo. pp. 52, 93).

## Material Facts Relevant to Defendants' Motion for Summary Judgment on Municipal Liability

### Allegation of wrongful hiring

47. Public Safety Director Craig Ford testified that at the time the Town hired Wheat to be the Major with the Town of Jonesborough Public Safety Department, he knew Wheat because they both had worked for the Washington County Sheriff's Department. Ford knew that Wheat had worked in the Criminal Investigation Division (CID) of the Washington County Sheriff's Department and he knew that Wheat had later been promoted to Assistant Director of the Drug Task Force (DTF). So at the time the hiring decision was made, Ford knew that Wheat had experience not only in criminal investigations, but also as Assistant Director of DTF. (Craig Ford depo. at pp. 17, 18 and Wheat depo. at pp. 16-17)

48. Public Safety Director Craig Ford hired Officer Wheat to be the Police Chief (or Major in Jonesborough) because he knew him from their time together at the Washington County Sheriff's Office. Director Ford also was aware that Wheat's investigative experience was limited to his role in CID and the Drug Task Force at Washington County. (Ex. No. 4, Ford depo. at 5 and 17) Ford later admitted that maybe "that's too much to put on anyone's plate." (Id.)

Defendants' Objection: The statement attributed to Ford was made on May 20, 2004 in a deposition and it references the fact that Officer Wheat was originally given investigative and administrative responsibilities. (Ford depo. pp. 16-17) As such, it is not material on the issue of wrongful hiring.

49. Director Ford later regretted his decision to hire Office Wheat because on at least two investigations that Wheat was responsible for, the alleged defendants were acquitted based on substandard investigations. (Ex. No. 4, Ford depo. p. 21 and further citation to be supplied by Plaintiff's counsel)

Defendants' Objection: The statement above is not supported by the page reference. The page reference states that after the Markwood and Boyd criminal cases fell through that Director Ford "need[ed] to review what's going on." Moreover, these facts are not material on a claim of wrongful hiring.

50. Besides two inadequate investigations, Officer Wheat also failed to handle certain internal Police Department matters he was assigned to. In a

Memorandum to Officer Wheat in which Director Ford suggested Officer
Wheat's termination, Director Ford asked rhetorically, "if you do not have the
investigative functions, or the training function, or the equipment function, or
patrol work, or dispatch work, what are you going to do with you time? " (Ex.
No. 17 Excerpt from Personnel file of Officer Wheat, Memo to Wheat from
Ford at 5)

Defendants' Objection: Mr. Markwood is relying on a January 2004
memo to establish wrongful hiring!? This is not material.

51. In that same termination memorandum from Ford to Wheat, the
reason that Ford hired Wheat and kept him becomes clear: "I have not been
pleased with your performance for some time, but have neglected the obvious
due to my feelings for you." Ford's personal feelings got in the way of a
responsible hiring decision. (Ex. No. 17 Excerpt from Personnel File of Wheat,
Memo to Wheat at 1[?] and at Ex. No. 4 Ford depo. at 11)

Defendants' Objection: Once again, Mr. Markwood is relying on a
January 2004 memo to support a claim of wrongful hiring. More importantly,
the undisputed proof is that prior to March 5, 2003, Director Ford had no
knowledge of any inadequate criminal investigations conducted by Steve Wheat.
Within a couple of weeks of March 5, 2003, Officer Wheat had all investigative
duties removed from him. (Ford depo. at Exhibit 30) Therefore, the factual
"arguments" contained in paragraph 51 are not only immaterial, they are not true
.

### Allegation of wrongful supervision

Defendants' objection: This issue was not responded to by Mr. Mark-
wood in his brief, and hence has been waived.

52. Steve Wheat began his career as a law enforcement officer in 1989.
(Wheat depo. at p. 6) He had criminal investigation experience as outlined in the
previous section. He was hired by the Town to serve as Major of the Public
Safety Department. Under the command structure at the time, Ford was (and is)
the Director of Public Safety, which meant that he was responsible for the
overall operations of the Police Department and the Fire Department. Wheat, as
Major, was responsible for the day-to-day operations of the Police Department,
and he was responsible for felony investigations. Other than Ford, Wheat was
the senior law enforcement officer for the Town. (Ford depo. at p. 11) Even
though Wheat could have pursued the Markwood investigation to a logical
conclusion without any oversight from Ford, it is undisputed that Wheat went
over the highlights of his investigation with Ford and Ford instructed Wheat that
he was to have the District Attorney's office review the file to make sure that the
D.A.'s office reached the same conclusion that Wheat had reached. Director
Ford gave this directive because he knew Markwood and he was afraid Mark-
wood would sue if a criminal charge was brought and was not successfully
prosecuted. (Ford depo. at p. 12)

10

53. Wheat was hired as the police major for the Town of Jonesborough, Tennessee, in 2000. Under Jonesborough's form of Government, the police major is in charge of the day-today operations of the department. (Ex. No. 4, Ford depo. at 10-11).

54. According to the 2000 census, the population of the Town of Jonesborough is 4,168. The Town area in square miles is 4.33. See, http://www.census.gov .

55. One of Wheat's responsibilities as police major was the conduct of investigations. (Ex. No. 16, Excerpt from personnel file of Wheat, Job Description). Later, Wheat was demoted (and almost terminated) from being in charge of the day-to-day operations of the police department to being a police sergeant. In March of 2003, one of the responsibilities removed from him was the conduct of investigations. (Ex. No. 17, Excerpt from personnel file of Wheat, Memo to Wheat from Ford; Ex. No. 4, Ford depo. at 14, 20-21).

Defendants' Objection: This paragraph is not material on the issue of municipal liability. It describes events that occurred after the criminal charge against Mr. Markwood was dismissed.

56. Wheat's supervisor, Craig Ford testified that when doing an investigation, police officers are taught to take notes of persons/witnesses interviewed for future reference. (Ex. No. 4, Ford depo. at 22). When Ford reviewed Wheat's file in the instant case, he found no interview notes. (Ex. No. 4, Ford depo. at 24). Wheat did not take any notes, but relied solely on his memory when he went to the grand jury, three (3) months after having heard Greene's complaint. (Ex. No. 5, Wheat depo. at 44-46).

Defendants' objection: This paragraph is not material on the issue of municipal liability *or qualified immunity*. To the extent that it is material, Officer Wheat's police case file contains the following:

A police report with a signed narrative statement of allegations signed by Greene, Sr. and Jr.;

A copy of the sale and financing agreement between Markwood and PACCAR;

A copy of the Sales/Insurance Agreement between Markwood and Greene;

A copy of letterhead from North Carolina attorney James Russell Sugg, Jr. with a handwritten note "6,119.22, total judgment";

A PACCAR "collections summary narrative" commemorating PACCAR's collection efforts and communications with Markwood prior to repossession of Mr. Greene's trailer and other equipment financed by PACCAR;

A PACCAR record showing all payments made by Markwood to PACCAR as well as incurred late charges form 8-23-99 to 12-26-00;

Wheat's handwritten calculations as to amounts deducted by Markwood from Greene's pay from January, 2001 through June, 2001. (See, Affidavit of Ron Street, Wheat's Reply to Plaintiff's Response to Motion for Summary Judgment)

57. There is no evidence of any complaints about Steve Wheat's investigative skills from mid-2000 up to March 5, 2003 (when the Boyd and Markwood criminal matters were dismissed). (Ford depo. at pp. 20-21, 30)

58. Within two weeks of those criminal dismissals, Public Safety Director Ford began the process of restructuring the Major's position so that Steve Wheat no longer had investigative duties. (Ford depo. at Exhibit 30)

59. This restructuring was completed the very next month when the Board of Mayor and Aldermen approved the restructuring. (Ford depo. at Exhibit 30)

60. From March/April 2003 forward Steve Wheat had no investigative duties. (Ford depo. at Exhibit 30)

61. The January 5, 2004 memo from Craig Ford to Steve Wheat is a detailed critique of Steve Wheat's problems as an administrator. (January 5, 2004 memo from Craig Ford to Steve Wheat, which is part of Collective Exhibit 21 to Wheat's deposition)

62. There is nothing in the January 5, 2004 memo critiquing Steve Wheat's investigative duties, which had been removed from him more than eight (8) months earlier. (Steve Wheat depo. at Exhibit 21)

Plaintiff's Objection: Plaintiff objects.

63. Again, in the suggested termination memo from Ford to Wheat, Ford listed some of Wheat's shortcomings that occurred during the time that Wheat was in charge of the police department (and the Markwood case): failure to implement necessary safety equipment in the Town's cruisers; failure to ensure that vital shifts in the Police Department are adequately staffed, Wheat's lying to Ford, inappropriate seizure of property at Wheat's direction, Wheat's failure to maintain an adequate level of training, and failure to follow through on orders. (Ex. No. 17 Excerpt from Personnel File of Wheat, Memo to Wheat from Ford at 2-4[?])

Town's Objection: The information allegedly contained in a January 2004 memo is not material to any issues of municipal liability.

Steve Wheat's Objection: The preceding characterization of specific factual events identified by Ford as shortcomings of Wheat in his memorandum of January 5, 2004 are conclusory generalizations of plaintiff's counsel's make as Mr. Markwood's advocate. Ford's memorandum contains very precise information that led to Ford's concerns about Wheat's administrative and management abilities. *See,* Ex. 4, Ford depo., Pl's *Response to Def's Motion for Summary Judgment.* A follow up memorandum from Ford to Administrator Browning dated January 12, 2004 is essential to understanding both the problems and solution regarding Wheat's job assignments and performance. The follow up memorandum of January 12, 2004 is not in the records before the court because these events which occurred in 2004 are not material or relevant to the objective standard applied regarding the existence of probable cause or qualified immunity. Should the court consider these events to be material or relevant, the memorandum of January 12, 2004 is now tendered as a late exhibit if approved

by the Court.

64. Soon after the Markwood investigation, another member of the Jonesborough Police Department was given Wheat's investigatory duties. (Ex. No. 5 Wheat depo. at 13)

## Allegation of failure to train

65. Mr. Markwood also relies on paragraph 56 on the issue of failure to train.

Defendants' Objection: The defendants also make the same objection that it is not material.

66. There is no evidence that Wheat lacked any training required by Tennessee law to be a certified law enforcement officer. In 1995, Wheat had taken a forty hour course on criminal investigation. (Wheat depo. at pp. 13-15 and Ex. 23)

67. Wheat was an experienced investigator. Before being hired by the Town, he had been a criminal investigator, detective with the Washington County Sheriff's Department for three or four years. (Wheat depo. at pp. 16-17)

68. Wheat did receive some training in doing investigations at the FBI Academy, which occurred after the Markwood arrest, but before the criminal trial.. Wheat was provided no training in conducting investigations while employed by the Town of Jonesborough, prior to the arrest of Markwood. (Ex. No. 4, Ford depo. at 26).

Defendant s' Objection: The facts in the above paragraph are not material on the issue of municipal liability.

69. During the events in the instant case, Wheat has been accused of arresting a citizen without probable cause in another case. See Boyd, et al v. Town of Jonesborough, et al, USDC Eastern District of Virginia, No. 3:03-CV-1030. Mr. Markwood believes the facts in this paragraph should be considered on both the wrongful training and wrongful supervision claims.

Defendants' Objection: The facts in the above paragraph are not material on the issue of municipal liability *or qualified immunity* because the dismissal of both criminal cases arose within one day of each other -- and that is what resulted in a change of duties for Steve Wheat. (Ford depo. at pp. 20-21, 30)

70. The Jonesborough Police Department has a policies and procedures manual, but there is nothing in it about how to conduct a white collar investigation. (Ex. No. 4, Ford depo. at 39).

Defendants' Objection: This fact is not material on the issue of municipal liability.

71. Prior to going to work for Jonesborough, Wheat had no particular training in doing "paper cases" (a term used by Wheat) or white collar cases. As well, he did not do these kinds of cases very often. (Ex. No. 5, Wheat depo. at 18-19). Mr. Markwood believes paragraph 45 should be considered on both the wrongful training and wrongful supervision claims.

13

<u>Defendants' Objection</u>**:** These facts are not material on the issue of municipal liability.

72. Wheat admitted that in "paper" cases it was important to give the supposed defendant an opportunity to explain, yet he did not talk to Markwood prior to the presentment and arrest. (Ex. No. 5, Wheat depo. at 20, 28). The reason he gave for not talking to Markwood beforehand was fear that Markwood would destroy records if he was aware of the investigation. Nonetheless, at the time of Markwood's arrest, there was no search (there never was) and no search warrant. (Ex. No. 5, Wheat depo. at 21-22).

<u>Town's Objection</u>*:* These facts are not material on the issue of municipal liability.

<u>Steve Wheat's Objection</u>: It was an initial concern of Wheat that Markwood might destroy essential records, but this became less of a concern as the investigation unfolded. Wheat also did not want to receive a prepared answer from Markwood and Wheat therefore attempted to speak with Markwood only at the time of his arrest. Markwood refused to speak to Wheat at that time saying "I'll do all my talking through my attorney". (Wheat depo. pp. 23-27, Wheat's Motion for Summary Judgment).

## Allegation of policy or custom of
## improperly hiring persons like Officer Wheat

73. Mr. Markwood relies upon the facts previously presented to address the issue of improperly hiring persons like Officer Wheat.

<u>Defendants' objection</u>: This issue was not responded to by Mr. Markwood in his brief, and hence has been waived. Moreover, the facts previously presented do not address hiring anyone other than Steve Wheat.

## Material Facts Relevant to Plaintiff's Motion for Summary Judgment

74. In support of Mr. Markwood's Motion for Summary Judgment as to the issue of whether or not there is probable cause, the Plaintiff relies upon the facts as presented herein.

<u>Defendants' objection</u>: The Plaintiff's Motion for Summary Judgment (which is really a Motion for Partial Summary Judgment) sets forth no facts -- much less sets forth any facts under the proper standard of drawing all reasonable inferences in favor of the non-movant. Therefore, the Defendants object to the Plaintiff proceeding with this Motion or attempting to correct this deficiency at the Eleventh Hour after this deficiency was clearly identified in a pleading filed by the Defendants on November 1, 2004. (Docket No. 36)

The "Sales Agreement: Insurance Agreement" is not reproduced in the parties'

Joint Statement.  It is handwritten and rather inartful.  It reads as follows::

> I Dave Markwood will sale [sic] to Darrell Green [sic] a 1995
> Doorsey [sic] Reffer [?] trailer, for the remaining pay off which
> is      $25,700.00   less what I have already paid on the
> trailer  -13,200.00    at 880 per mo. to be deducted from Darrell
>          12,500.00
> Green's [sic] pay settlements each week or each paycheck at the
> rate of 220.00 each check.
>
> I also agree to take out cargo & liability ins. at the rate of 143.33
> per pay day or each check.  For truck and trailer.
>
>                    x /s/ Dave Markwood
>
>                    x /s/ Darrell Greene

Plaintiff's Deposition, Exhibit 1.

At oral argument the parties advised that they inadvertently left out one relevant

and undisputed fact which should be included: that at the time Steve Wheat was

investigating Mr. Greene's allegations against the plaintiff Markwood, Wheat knew that

Markwood was a convicted felon (forgery).

The agreement between Markwood and Greene teems with ambiguities, patent

and latent.  Nevertheless, the relevant facts are undisputed.  As will be discussed in

more detail later in this report, Markwood agreed to sell to Greene a trailer for

$12,500; that trailer was encumbered by an indebtedness owed by Markwood to

PACCAR Financial; that indebtedness was secured by a lien on the trailer; Markwood

and Greene agreed that Markwood would withhold monies otherwise owed by Mark-

wood to Greene and remit those withheld monies to PACCAR to be applied on the

15

indebtedness owed on the trailer; during the first eight months (May 17, 2000 to January 12, 2001) of Markwood's and Greene's agreement, Markwood had to use $2353.05 of his own funds to make the required monthly payments to PACCAR Financial; after January 12, 2001, Markwood ceased making any payment at all to PACCAR Financial, although he continued to withhold monies he owed to Greene; during this period, Markwood withheld from Greene $4544.63, none of which he remitted to PACCAR Financial, and which was $2191.58 over the amount that Markwood arguably was entitled to reimburse himself for his "personal" payments made during the period May 17, 2000 to January 12, 2001; due to Markwood's failure to make payments to PACCAR Financial, PACCAR repossessed the trailer; Markwood also withheld from monies he owed Greene a total of $4300.05 for insurance he was obligated to purchase on Greene's behalf, but which he did not.

After PACCAR Financial repossessed the trailer, Mr. Greene complained to Officer Steve Wheat of the Jonesborough Police Department, who subsequently conducted an investigation of sorts. After consultation with the District Attorney General's office, the matter was presented to a grand jury which returned an indictment against Mr. Markwood. When the matter was tried, the Criminal Court Judge was thoroughly unimpressed with the state's proof and dismissed the case *sua sponte*.

Claiming that his arrest and subsequent prosecution were made without probable cause, this suit resulted.

Officer Wheat in his individual capacity has moved for summary judgment on

16

three bases: (1) that the plaintiff is judicially estopped to pursue this litigation; (2) that there was probable cause to arrest and thereafter prosecute the plaintiff Markwood for the crime of theft; and (3) even if there was no probable cause to arrest and prosecute plaintiff, Wheat nevertheless is entitled to qualified immunity. [Doc. 17.] In the Motion for Summary Judgment filed by the remaining defendants [Doc. 18] – Steve Wheat in his official capacity, Craig Ford in his official capacity, and the Town of Jonesborough – those defendants likewise insist that the plaintiff is judicially estopped from maintaining this suit and, like Wheat in his individual capacity, assert that Wheat had probable cause to arrest and prosecute plaintiff. Additionally, the Town of Jonesborough argues that there is no basis from which it can be found that a policy or practice of the Town proximately caused a violation of plaintiff's constitutional rights.

Plaintiff's Motion for Summary Judgment [Doc. 24] insists that the undisputed facts reveal as a matter of law that there was no probable cause to arrest him and he asks that this Court so find.

Each of these issues presented by the Motions for Summary Judgment will be addressed separately.

## JUDICIAL ESTOPPEL

On September 10, 2002, the plaintiff Markwood was arrested for theft and taken to jail. At the time of his arrest, Mr. Markwood believed that he had done nothing wrong, and that his constitutional rights had been violated.

17

On December 13, 2002, plaintiff Markwood filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Tennessee, in Greeneville.  In that petition, he estimated his assets as between zero dollars to $50,000; he estimated his debts as between $500,001 to $1,000,000.

On January 28, 2003, the plaintiff Markwood filed an amendment to his petition, specifically to "Schedule B - Personal Property"; he said nothing therein about a potential claim or suit regarding a violation of his civil rights.  On that same date he filed an affidavit with the bankruptcy court in which he swore that the amended schedules were true and accurate statements as of December 13, 2002, the date he filed his petition.

On February 26, 2003, the Bankruptcy Trustee filed her report and stated that there was no property available for distribution from the bankrupt's estate.

On March 5, 2003, plaintiff Markwood's criminal case went to trial, resulting in a dismissal by the Criminal Court Judge.

On April 1, 2003, Bankruptcy Judge Parsons entered a "No Assets" Chapter 7 discharge of Mr. Markwood.  On May 19, 2003, Judge Parsons entered a final order that closed plaintiff's Chapter 7 bankruptcy.

Plaintiff filed his § 1983 action in this Court on September 5, 2003, seeking $1,000,000 in compensatory damages and $1,000,000 in punitive damages.

Mr. Markwood was represented by Attorney Tom Cowan in both the criminal and bankruptcy proceedings.  Attorney Cowan did not suggest to the plaintiff Mark-

wood that he had a civil rights case as a result of his arrest and prosecution, nor did

Attorney Cowan suggest to plaintiff that he should list a civil rights claim as a potential

asset in the bankruptcy proceeding.  It was not until the dismissal of the criminal case

and plaintiff's discharge in bankruptcy that plaintiff specifically asked Attorney Cowan

about filing a civil rights lawsuit; Attorney Cowan told Mr. Markwood that he did not

believe that Markwood had a viable civil rights claim but that he was "free to consult

with another attorney . . . ."  The plaintiff Markwood subsequently sought a second

opinion from Attorney John Eldridge on August 29, 2003, and, to state the obvious,

Attorney Eldridge held an opinion quite different from that of Attorney Cowan.

　　　The defendants insist that these facts judicially estop plaintiff from proceeding

with this suit.

> The doctrine of judicial estoppel bars a party from (1) asserting a
> position that is contrary to one that the party has asserted under
> oath in a prior proceeding where (2) the prior court adopted the
> contrary position "either as a preliminary matter or as part of a
> final disposition."

*Browning v. Levy*, 283 F.3d 771, 775 (6th Cir. 2002).

　　　Thus, under *Browning* there are two requirements which must be satisfied for

the application of judicial estoppel: (1) the assertion by a litigant of a position that is

contrary to one that the party asserted under oath in an earlier judicial proceeding, and

(2) the court in that prior proceeding must have adopted that contrary position either as

a preliminary matter or as part of its final disposition.

　　　The facts surrounding Mr. Markwood's filing of his bankruptcy petition

certainly satisfies the first requirement; he represented to the Bankruptcy Court, under oath, that his assets were no greater than $50,000 and *that he had no contingent assets.* For purposes of the bankruptcy code a "contingent asset" undeniably includes a pending or potential lawsuit. Nor is it necessary that the debtor know the precise nature or identity of his cause of action and the various other legal niceties; it is enough that he knows he has been harmed by another's wrongful actions and that he may have a right of redress:

> It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims. . . . "The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action". [Citation omitted.] *"The debtor need not know all the facts or even the legal basis for the cause of action; rather if the debtor has enough information . . . prior to confirmation to suggest that [he] may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed."* [Citations omitted.] [Emphasis supplied.]

*In Re. Coastal Plains, Inc.,* 179 F.3d 197, 207-208 (5th Cir. 1999).

At the time of his arrest, Mr. Markwood believed that he had been falsely arrested and that his constitutional rights had been violated. Under *Coastal Plains, id.,* he was obligated to list that claim as a contingent asset on Schedule B to his bankruptcy petition. Upon reflection, it is noted that this rule is no different from that regarding the running (or tolling) of a statute of limitation. A statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action; ignorance of a right to file suit does not toll the statute. *See, e.g., Sevier v.*

*Turner*, 74 F.2d 262, 273 (6th Cir. 1984).

Plaintiff argues that his failure to list his claim against Steve Wheat and the Town of Jonesborough nevertheless was "inadvertent," relying upon other language in *Browning v. Levy, supra*:

> Although this Court has not addressed whether bad faith or an attempt to mislead the Court is a necessary perquisite to the application of judicial estoppel, other [circuit] courts have held that judicial estoppel is inappropriate in cases of conduct amount-ing to nothing more than a mistake or inadvertence.

283 F.3d at 776.

Plaintiff's counsel candidly acknowledged that his "defense" of inadvertence amounts to "advice of counsel," namely, that of Attorney Cowan. It will be recalled that Attorney Cowan did not believe that plaintiff had a viable cause of action against Steve Wheat and others, and Attorney Cowan did not deem it necessary to list a contingent claim on Schedule B to Markwood's bankruptcy petition, which implicates "advice of counsel." However, a recent unreported case from the Sixth Circuit has facts very similar to the ones before this Court. In *Lewis v. Weyerhaeuser Co., d/b/a*, 2005 WL 1579713 (6th Cir. 2005), the plaintiff filed a Title VII employment discrimi-nation suit against her former employer. Plaintiff was fired from her employment in October 2001. She and her husband filed a Chapter 13 bankruptcy petition in Decem-ber 2001. The plaintiff did not list a potential employment discrimination claim in Schedule B to her Chapter 13 petition. The plaintiff's Chapter 13 bankruptcy plan was approved by the Court on February 26, 2002. One month later, on March 29, the

plaintiff's attorney sent a letter to the Equal Employment Opportunity Commission in which it was alleged that the plaintiff's former employer unlawfully discriminated against her. The plaintiff ultimately filed a Title VII suit in district court in October 2002. The defendant employer moved for summary judgment on the basis of judicial estoppel. The plaintiff resisted the motion, filing her affidavit in which she asserted that she relied on the instructions of her bankruptcy attorney's paralegal, who advised her not to mention the potential discrimination lawsuit.

The Sixth Circuit in *Lewis* stated that "it is well-settled that judicial estoppel does not apply where the prior inconsistent position occurred because of 'mistake or inadvertence.' [Citing *Browning, supra.*]" 2005 WL 1579713 at *5. In addressing whether "advice of counsel" could constitute inadvertence, the Court said:

> We also find unpersuasive [plaintiff's] assertion that she relied in good faith on the advice of her attorney's paralegal. In a similar case, the 11th Circuit noted that although the "[debtor's] attorney failed to list [the debtor's] discrimination suit on the schedule of assets despite the fact that [the debtor] specifically told him about the suit, the attorney's omission is no panacea. [Citations omitted.]

*Id.*, at *7.

Advice of counsel simply is not available to the plaintiff Markwood to defeat the defendants' plea of judicial estoppel. Mr. Markwood knew that he had been wronged, he knew who did it, and he believed that his constitutional rights had been violated. Regardless of what Mr. Cowan believed, Mr. Markwood was not relieved of the obligation to appropriately report his potential claim as a contingent asset on Schedule

22

B to his bankruptcy petition.

Defendants' plea of judicial estoppel is well-taken and it is recommended that his suit be DISMISSED for this reason.

## *PROBABLE CAUSE*

If there was probable cause to arrest and prosecute the plaintiff Markwood, then there was no constitutional violation and he has no § 1983 claim against any party. This issue presents an extremely odd situation. During oral argument, the Court referred to it as "paradoxical," and that indeed is an accurate description.

"In Tennessee, probable cause is a 'reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [person] in the belief that a person accused is guilty of the offense with which he is charged." *Lea v. State*, 181 S.W.2d 351, 352 (Tenn. 1944). In other words, probable cause is merely those facts which would lead a reasonably prudent person to believe that, more likely than not, the accused committed the offense with which he is charged. Probable cause "is determined . . . *at the time of the arrest or search by the officer*." *See,* RABIN TENN. PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 18.51 (2003) [italics supplied]. To re-state the obvious, the facts that constitute probable cause for an arrest must be known to the officer *at the time of the arrest*. If the facts known to the officer at the time of the arrest do not constitute probable cause, then the arrest is illegal under the Fourth Amendment, and that illegal arrest cannot be retroactively validated by

23

either "after-acquired" evidence or even evidence in the officer's possession of which he was unaware. And this leads us to the paradox referenced above: Wheat had in his possession, i.e., in his file, more than sufficient facts to constitute probable cause for the arrest and prosecution of Mr. Markwood. The totality of facts contained in Mr. Wheat's file, had he but done a few rudimentary mathematical calculations and a more thorough examination of the facts, would have revealed that the plaintiff Markwood withheld from Mr. Greene far more money than Markwood paid to PACCAR Financial out of his own funds. Specifically, Markwood paid PACCAR Financial $2353.05 more than he received from Mr. Greene during that period of time from May 17, 2000 through January 12, 2001. However, after January 12, 2001, Markwood ceased making payments altogether to PACCAR Financial, notwithstanding that he continued to withhold monies owing Mr. Greene. Indeed, from February 2001 through June 2001, Markwood withheld $4544.63 from Mr. Greene, and remitted *none* of that money to PACCAR Financial. Even if he had the right to reimburse himself $2353.05 for the funds he paid PACCAR Financial from the period May 2000 to January 2001, he ultimately collected $2191.58 over that amount.[3] However, only a portion of this information was passed on to the Assistant District Attorney General and ultimately the

---

[3]Moreover, Markwood also withheld an additional $4305.00 of Greene's monies which he was obligated to use to purchase insurance coverage for Greene, which he did not do. Therefore, Markwood had $6496.58 of Mr. Greene's money which he converted to his own use. Inasmuch as Wheat did not know about the insurance monies (even though the information was in his possession), it cannot be considered in the probable cause analysis. It can be considered, however, in the qualified immunity analysis, *infra.*

grand jury. Wheat looked only at the period of time from February 2001 through June 2001, which revealed that Markwood had retained $4544.63 of Greene's money that should have been forwarded to PACCAR, but which was not. Had Wheat done a better job, and looked at the period of time from May 2000 through January 2001, he would have noted that Markwood had to pay PACCAR Financial $2353.05 out of his own pocket because Mr. Greene had made an inadequate number of trips to generate the requisite income. Thus, Wheat's "sin," if you will, is that he *inflated* the extent of Mr. Markwood's theft. In reality, Mr. Markwood had converted to his own use only $2191.58 of Greene's money, not $4544.63.

Theft is theft, whether it be $4544.63, or $2191.58. Both figures exceed the statutory threshold of the crime with which Mr. Markwood was charged – theft of over $1000. Mr. Wheat undeniably did a sloppy job of investigating this matter and presenting all the available facts to the Assistant District Attorney. But, as stated previously, the facts that he did not present to the Assistant District Attorney General and the grand jury were *more* damning as far as the plaintiff Markwood is concerned, and clearly did not suggest either innocence or a lack of probable cause. Conversely, the facts he did present constituted probable cause to believe that Mr. Markwood committed theft of property exceeding $1000 in value. It is therefore recommended that defendants' motions for summary judgment should be GRANTED and that plaintiff's motion for partial summary judgment be DENIED.

25

## *QUALIFIED IMMUNITY*

If it be assumed for the sake of argument that this Court has wrongly concluded that there was probable cause for Mr. Markwood's arrest and prosecution, ***then the information in Mr. Wheat's file***, *the significance of which he did not appreciate because of his sloppy work, and which he did not pass on to the Assistant District Attorney General*, ***may be considered by this Court.***

As discussed in the section preceding regarding probable cause, any facts in the officer's file which were not considered by him in arresting the accused cannot be considered by the Court in determining whether probable cause existed for the arrest. That is not the case, however, with respect to an analysis of a claim of qualified immunity. Assuming that a constitutional violation has occurred, and assuming further that the constitutional right was clearly established at the time of the violation, were the officer's actions *objectively unreasonable* in light of that clearly established right? *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). Obviously, the test is an objective one, not subjective. Thus, what *Mr. Wheat* knew or did not know at the time of defendant's arrest is quite beside the point. Rather, the test is what would an objective, reasonably-trained police officer have believed *based on the information in Wheat's file at the time of the arrest.* The information in Wheat's file would have clearly revealed that Markwood had retained $8849.63 of Mr. Greene's funds; $4544.63 which he should have passed on to PACCAR, and $4305 for insurance he did not procure. After Markwood's personal payment to PACCAR in the amount of

26

$2353.05 is deducted, he still retained $6496.58 of Greene's money without justification. Further, that objective, reasonable officer would have known that Mr. Markwood had a previous felony conviction for forgery, and that the trailer ostensibly purchased by Mr. Greene had been repossessed by the lienholder due to Mr. Markwood's default. Not only is that *arguably* probable cause, it is in fact probable cause to arrest and prosecute Mr. Markwood for theft of over $1000.

Mr. Wheat is entitled to qualified immunity.


### WRONGFUL HIRING, WRONGFUL SUPERVISION, FAILURE TO TRAIN

These three allegations are directed against Craig Ford, Officer Wheat's immediate supervisor, and the Town of Jonesborough, Wheat's employer.

For purposes of the discussion which hereafter ensues, it is assumed that Officer Wheat was a poor investigator, and an especially poor investigator regarding embezzlement-type offenses. However, there is no fact in the parties' joint statement that even remotely suggests that any official of the Town of Jonesborough had any inkling of Wheat's incompetency in that particular area at the time of his hiring; indeed, his credentials were rather impressive. Nor is there any fact in the joint statement that suggests, up until this case and the *Boyd* case (also filed in this Court), that Wheat had any deficiency as an investigator. The *Boyd* case and the instant case lead to the Town of Jonesborough and its officials to conclude that Officer Wheat

27

should be relieved of his investigatory responsibilities and he thereafter was placed in an administrative position. He ultimately did a rather poor job as an administrator, and he was relieved of that position. But the issue is what the Town of Jonesborough knew at the time it hired Wheat, and there was nothing to suggest that Wheat was anything other than a competent police officer. Nor is there any fact in the parties' joint statement that remotely suggests that Wheat was inadequately supervised or trained. There simply is no basis to impose liability on Mr. Ford or the Town of Jonesborough under § 1983.

### *CONCLUSION*

It is respectfully recommended that the defendants' Motions for Summary Judgment be GRANTED and that this suit be dismissed as to Steve Wheat in his individual capacity, and that it be dismissed as to Steve Wheat and Craig Ford in their official capacities, and that it be dismissed as to the Town of Jonesborough.

It is recommended that all claims filed against any of the defendants under 42 U.S.C. § 1983 be DISMISSED.

There remain state law claims of assault and battery, false arrest and imprisonment, malicious prosecution, and outrageous conduct. It is further recommended that those state law claims be remanded to state court for disposition.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and

(C).  *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).  If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission.  The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

      Respectfully submitted,


                __s/ Dennis H.  Inman__
                United States Magistrate Judge